All right, so we have one argument this afternoon. We appreciate the hospitality in Houston of hosting us yet again, and appreciate Ms. Valdez's assistance to us, as well as Ms. Trice, coming from New Orleans. All right, so we'll go ahead and call case number 16-20517, U.S. v. Dailey. And Mr. Willa, you're up. And before you start, are you okay now? Yes, ma'am. They put an implant in me, and everything's doing pretty good. Well, we're glad to see you up and about, and I'm glad you could be here. And I appreciate the court's indulgence and counsel's indulgence in rescheduling the oral argument. Sure. All right, you can begin now. May it please the court. First issue in this case that I'd like to discuss with the court is, is whether or not this prosecution should have even proceeded. The appellate contends that the prosecution, as written in the indictment, violates the ex post facto clause of the United States Constitution. And we say that for the reason that Dr. Dailey complied with the Affordable Care Act's mandates and Texas law, as promulgated by the Texas legislature and the Texas Medical Board, as to attesting to whether or not a patient needed home health care. How could he say that any of these people were under his care when he didn't have any records for them, had never talked to them? I mean, never mind the face-to-face. I mean, he had just zero involvement with them at all. How can that be the equivalent of care? Your Honor, I'm glad you asked that question, and I was prepared to answer it. If you will look, we gave you some exhibits this morning. If you will look at tab three, and the definition of practicing medicine and providing care. In Texas, practicing medicine or providing care means the diagnosis, treatment, offer to treat a mental, physical disease or disorder or a physical deformity or injury by any system or method, or attempt to effect cures of those conditions. Those parameters are in the disjunctive. They are not in the conjunctive, which means as the law stood under the Affordable Care Act, and as the law stood under the state of Texas, you did not have to even see the patient. Well, let's ask Judge Haynes' question in a different way. What basis did your client have for verifying that these people needed home health care? Because the federal law and the state law allow the face-to-face meeting to be done by physician's assistants. They are to, on the top of the Form 85, they are then to put forth a diagnosis, and the patient's treatments that they think that they need and their present condition. After that is done, Your Honor, that form is brought back to the physician who, under Texas law, looks at the diagnosis, treatment plan, and everything that's up there, and that's signed by that physician's assistant. Okay, but how, I mean, what medical records does he have even from a physician's assistant? The physician's assistant, if you look at the Form 85s, which are in the record, completely delineates the patient's condition, status, blood pressure, weight, what other conditions that they have. Everything that's up there is on the top page. So the record is the Form 85. The record is the Form 85. All right, now doesn't the law, though, require that the physician assistant in question be under the supervision of the doctor? And what evidence is there that David Onyuroa, I don't know how to pronounce it, was under Dr. Daley's supervision? What the federal law says under the Affordable Care Act before its amendment was they have to be in collaboration with, and we provided you that on tab one. It's underlined in red. It's in that first section, Your Honor. Okay. I mean, the problem is it says in accordance with state law, and state law requires that the person be under the supervision, and this guy, so far as I can tell, was not. No, under the supervision, under the Texas law, and we gave you the administrative code statute, what that means, that is that person, in order to be under the physician's care, the physician under state statute has to be fully competent, and the physician has to believe that he is fully competent to perform those duties. But doesn't a physician assistant under Texas law register with a particular physician's name? You can, but not necessarily, because physician's assistants can be independent. As a matter of fact, if you go into some of the hospitals right now, they are their own entities. And so what that physician assistant does, he worked with Dr. Daley. He brought the Form 85 to Dr. Daley, and what is really. Well, what supervision did Daley exercise over him? He wasn't in Daley's office doing this. If it's all about supervision, what supervision existed? The supervision is to check to make sure that the physician's assistant is qualified, and we have under tab two where not only did Special Agent Gomez testify on the stand, but he also made a report on the stand that both Anyanora and Ukabu were both qualified PAs. That is part of the record, and that is not in dispute. So if they were qualified PAs and he was satisfied, and the statute says he has to be satisfied with their qualifications, and he was, then they are allowed to go out and make the diagnosis, treatment plan. Okay, so supervision is simply, I've read your resume, looks good to me, I'm done, that's supervision? Basically, if they're qualified, and that's what the statute says, Your Honor. Okay, the statute says that a supervising physician is someone licensed and so on and who has notified the medical board of the intent to supervise a specific physician assistant and of the termination of such supervision. Where do we have evidence of that notification? And that's one of the things that we said in the record, Your Honor. There is no evidence one way or the other, but what we're saying is as far as the record is concerned. But what we do have is that they were qualified, they did do that, and plus what we also said in our brief and that you see in the exhibits that are before you is that if the physician's assistants, after they did their evaluations, or the patients thought that they were not qualified, those 485s were never delivered to Dr. Daley. If the physician's assistants thought they were qualified, they were delivered to Dr. Daley. So then how do you explain these two people that clearly didn't need home health? Well, and that's why we said we wonder who should have been prosecuted in this case because all a physician does is when he gets to 485s, he sees what's been certified by either the nurse or the physician assistant. That's what's at the top of that 485. And then after that, he makes the determination of which state law allows. Right, but somebody saw these patients, right? You're saying it's the physician assistant. Correct. Okay. And how did he, how was he, you're saying he was fooled by them, they pretended to be needing home health care, but they didn't need it? Well, some of the testimony that came out, which is in the record, is the fact is that the patients just lied because they were recruited, they were paid, and what they were going to do was get a kickback out of the money that they got for being home health care. Now, Dr. Daley wasn't involved in that. He wasn't there. He was getting a separate kickback of $400 a month. I mean, your argument, these may be good arguments for why your client wasn't guilty, but to put the proper posture back at the forefront, the jury found your client was guilty. So the question is just whether there's some basis sufficient to support that verdict. And everything you're saying, I think, is going to the certification, the health care fraud counts. I don't think any of this about the physician's assistants would excuse the kickbacks of $400 a month. But even on the health care fraud, can't the jury consider the fact that he was getting kickbacks, $400 a month for signing these? Isn't that itself evidence of health care fraud, even though they're separate offenses? I beg to differ, Your Honor, respectfully. And the reason that I beg to differ from that is the $400 was for him to evaluate whether or not the patients required home health care. It had nothing to do with filing a claim with Medicare. It had nothing to do with the recruitment of patients to Kansas. Yeah, but there is no reason to certify them for home health care unless Medicare is going to be paying. I mean, if the people are private pay, they can pay what they want, and if they are fully running marathons but they want the doctor to come or they want the therapist to come to their house and willing to pay for it, nobody's going to care. The answer here is, and it's known to everybody, the reason there's a certification for home health care is because of Medicare. Your client knew that. Everybody knew that. So how can he justify getting paid by the entity providing the home health care to certify them? Regardless of whether they need it or not, that's not proper. Well, Fifth Circuit law says in order for you to have a kickback, you have to have a remuneration for either inducing referrals or directly referring a patient. That is Fifth Circuit black-letter law. That didn't happen in this case. In this case, he got paid $400 whether he signed 145 a month or whether it was 15485s a month. All he did was getting paid as a consultant. Was there any evidence that there was a 485 proper to him that he refused to sign? Yes, Your Honor. Tell me about that. Okay. We go back to page 2 of the exhibit, tab 2, at the very bottom. As a matter of fact, what it says is if the PAs deny admission to the patient, they don't even take the paperwork to Dr. Daly. I understand that. I'm not asking that. I'm saying he wouldn't know about that. So was there a document submitted to Dr. Daly, a 485, that he refused to sign because he said, I'm looking at this and I have questions about this patient or I don't think this patient needs home health care or anything like that? Yes, Your Honor, and that's in the record. Where? Well, I'm going to say it to the court. I will supplement that record reference for you because I don't have it in front of me right now. You said in your defense the trial was the $400 was for consulting services? Yes, sir. What evidence is there of any consulting, that is, talking to the physician's assistants, talking to the patients, talking to the home health care provider, other than just signing a stack of papers, which would probably take about 30 seconds? Respectfully, Judge Costa, that's not what the law requires. Well, I'm asking what's in the record. You said he's a consultant. Right. What did he do to consult? The consulting is to evaluate. He's signing the papers. No. No, sir. To evaluate the physician's assistant's diagnosis, treatment plan, health history of the patient. Did he ever correct the physician's assistant's recommendations? That I don't know, Your Honor. Okay. But how can he justify getting paid by the home health care agency for that? I mean, that to me is a real problem, even if everything else is on the up and up, because typically the way it works is the patient pays the doctor and or Medicare or the insurer for the patient pays the doctor, not the health agency that's going to benefit, whether you want to call it a referral or not, benefit from the certification. Without that certification, they're not going to provide the service because the patient isn't going to pay themselves and there is nobody that's going to pay without the certification. Well, Judge Haynes, if you look at the statute as it's written, you don't get paid directly for that. The 485s are done. The home health care agency then takes those and then submits those for what they decide they're going to treat the patient for. Understand, the 485s do not dictate what the home health care agency does. It only looks at the patient's condition. But without it, there is not going to be home health care that gets paid by Medicare, period, end of story. There is no question about that, and your client knew that. So how can he justify or explain or claim ignorance of this scheme when he's accepting money from the health care agency to do a certification that will directly lead to payment for these services? The conspiracy case law in the Fifth Circuit is very specific. You have to have an agreement to defraud Medicaid. There is no evidence in this record. Well, that's on the health care fraud, not on the anti-kickback. On the anti-kickback, it's even with that. What authority says you have to defraud Medicare? I thought you can violate the kickback statute if Medicare never loses a dime because the theory is these decisions, whether or not they defraud Medicare, shouldn't be made based on a financial incentive but should be made based on an objective medical diagnosis. I will give you the definition. In order to what the Fifth Circuit case law says, it says specifically that you have to either induce a referral, directly refer, or recruit. That is Fifth Circuit case law. There's nothing in this record, and even Ms. Ebolema, who was the principal of Candid, testified on the stand. And one of her last statements was, Dr. Daley never recruited any patients, he never referred any patients. And I will give you the Webster's New Collegiate Dictionary, 970. I'm familiar with that case law, and I have some questions for the government about it. That's the issue of whether you have to actually pick the patients, pick the provider, as opposed to just do a certification. That's correct. But I thought you were saying a kickback violation requires showing that Medicare was defrauded. No, the kickback violation requires that you either refer the patient directly, recruited a patient to them, or received an inducement to refer a patient. There's nothing in this record that shows that any of that ever occurred. Let me ask you one thing because you're running out of time. If we were to agree with you on some of the counts but not all of the counts, does there need to be a resentencing? If we disagree with you on Count 1, which was a 63-month sentence, but we agree with you, let's say, on Counts 4 and 5, which were 60-month concurrent, do we need to remand for resentencing, or would we be done? You'd probably have to remand for resentencing, Your Honor. Why? Because they were concurrent sentences. Well, 63 was one and then 60 for the concurrent. No, all of them were running concurrently, right? No, I said one was 63 and the other was 60. And then the 2 through 5 were 60 months, but all of that was concurrent, right? That's correct. So he's serving one 63 months. That's correct, Your Honor. And so if we affirmed Count 1 but reversed on some other count,  Well, in that case, you wouldn't, Your Honor. Okay, all right. With my last 16 seconds, I'd like to go to my jury instructions, which clearly show where the evidence was raised by both the government and the defense. And jury question number one asks a question that exactly tracks the statute, and that jury question should have been answered. I mean, it should have been proffered by the district court. I'm out of time for my opening. Okay, you save time for rebuttal, though. Five minutes, Your Honor. We appreciate it, yes. All right. Mr. Gould, the government. Good afternoon, and may it please the court. Andrew Gould for the United States. I think it's important to place this case in the context of the indictment. The indictment charged that Dr. Daley conspired to commit Medicare fraud through his agreement with Chudy, the owner of Candid Home Health, to defraud Medicare by submitting fraudulent Form 485s, authorizing unnecessary home health services, in order to pilfer from Medicare's purse. And the indictment further charged that Dr. Daley received illegal kickbacks, specifically $400 a month in exchange for his fraudulent signatures, which effectively referred Medicare patients to Candid for home health services. Now, based on the overwhelming evidence establishing these allegations, the jury rightfully convicted him. Yeah, but his argument is maybe he wasn't a very good supervisor, if you will, of this physician assistant, but all he's required to do is check the resume and get the stuff from the physician assistant, look through it, it looks good, sign off, he's good to go, so he's not part of any fraud. If the physician assistant's gone and these people are either lying to him and saying they're homebound, or he's just not really doing his job, but he's saying he is, how is Dr. Daley accountable for that? Dr. Daley is accountable. I mean, the government didn't charge him with committing Medicare fraud or violating the anti-kickback statute because he violated our particular Medicare statute or regulation, or Texas law, for that matter, which is irrelevant. It charged him based on his agreement with Chudy to submit fraudulent Form 485. Yeah, but he's saying that his agreement was to review the work of this own URAR, however you pronounce it, and sign off where appropriate, which apparently was every time, in his mind. And so while, again, not something I would, if I was advising a doctor of how to run his practice, I wouldn't advise him to run it that way, but how is that criminal? That's the argument. First, I just want to answer a question that was posed to opposing counsel. You asked where it was in the record if he signed every form in front of him. That's at ROA 678, in which Chudy testified that he signed every Form 485. Now, back to the supervision point. These are all arguments that he made to the jury. This goes to his consulting services defense, that it was merely an agreement that for $400 a month he would review these Form 485s, and he would sign them if they qualified. And again, at ROA 678, every one of them qualified. We're here on appeal, and the question is, could a reasonable jury have discredited that defense? Easily. Easily it could have done so. I mean, by itself, with the evidence of the checks, Chudy's testimony was sufficient. Chudy testified. She heard about Dr. Daley from other home health agencies that operated fraudulently. As somebody who would sign Form 485s for money, she set up a meeting with him, and she testified about this meeting. It lasted 15 minutes. He asked her no questions, nothing about her background, her qualifications, about the agency. Instead, they made an agreement. For $400 a month, he would sign the Form 485s presented to him. So there's no doubt he was getting this money. What is the best evidence that he knew the certifications were false, given his argument that he was relying in good faith on these physician assistants? I mean, the best evidence, Your Honor, is the fact that they weren't under his care. The patients? The patients were not under his care. What do you do with this definition of care that he gave us? Yeah, the Texas definition of providing care is simply irrelevant. It's simply irrelevant to this matter. The relevant term here is not providing care under Texas law. It's under the care of a physician. That is the relevant term. They're different. And what did the jury hear? What was the evidence presented? The evidence presented was that under the care of a physician, which is not defined by Medicare, means an established patient-physician relationship. And what the witnesses, including the doctors, uniformly testified is this means that you have met the patient at some point in history. So putting aside the face-to-face meeting that the Affordable Care Act made express, even before the Affordable Care Act, you were still certifying they were under the care of a physician. So you're saying that nowadays there's these kind of WebMD virtual doctor kind of situations. So if I used, I don't know, I'm not that tech savvy, but if I used Skype to visit a doctor in Minnesota and we looked at each other and talked and I gave my symptoms and he gave a diagnosis and all of that, that would not be, I would not be under his care. That's your position? If, I mean, I think if you had a virtual meeting like you're talking about, that might suffice for establishing a relationship. I mean, here what the evidence showed, though, was that these patients never met him. I mean, they had no idea who he was. Some of them lived hundreds of miles away. So, I mean, there's simply no evidence. So you're saying we don't need to decide if face-to-face can include Skype or any of those kind of mechanisms or even a telephone. You're saying there needs to be some contact of some sort, at least, and that wasn't present here. Yes, there has to be at a minimum an established patient-physician relationship. And it can't be enough that the physician, let's assume arguendo that this David Onura actually went, I mean, I'm a little bit suspicious about it, but let's say he actually went and met these people and they were lying in bed moaning and whatever, and he concluded they really were homebound and so advised Dr. Daly, who then signed the 485. We would say that's still not good enough. If, I mean, so under 42 CFR 424.22, this is the federal regulation. It's cited in the government's brief. The physician assistant has to practice under the physician's supervision, and there was no evidence whatsoever that Dave Onura was under Dr. Daly's supervision. I mean, this was just, you know, this was a PA hired by Candid to, you know, meet with these patients and essentially just fill out the forms. So who was paying Onura? Chudy was. Okay, so Dr. Daly never paid anything to Onura? No, that's correct. And what do you make of this argument that supervision requires simply reviewing someone's resume and making sure they're qualified? I fundamentally disagree. I mean, even under Texas law, I mean, there's a requirement that to practice medicine as a physician assistant, you have to register your license under the physician's license and vice versa. I mean, that didn't happen here. I have a few questions about the kickback statute. There's Part A and Part B, and I think defense counsel is saying it wasn't a kickback because he wasn't the one who got the patients going to this particular home health care provider. They already decided to go to this home health care provider. He just provided the necessary certification. But so the statute, Part A is about referrals. Part B is about recommending services. And you try to defend the verdict by saying, well, it certainly fits within B. You also argue it fits within A, but I think your primary argument is it fits within B. And the indictment did charge A and B, but it looks like the jury was instructed only on subpart A. So don't we have to decide whether the verdict can be supported under the Part A? If the jury was indeed instructed simply under A, then yes. But you said that our primary argument was that it was based on the recommendation. Yes, we put that first. We rely on them equally. I mean, this was referral. By him signing it. Does a referral in the government's view have to be to a particular provider, or can it just be certifying that you need home health care? I mean, it's a little more than that, Judge Costa. I mean, it's signing the Form 485. And when you sign the Form 485, you're selecting the particular home health agency. It has that space to fill out the particular agency. Exactly. And that's what the government relied on, is that it's his signature on Section 26. But isn't it true that with every 485, so let's say my elderly dad needs home health care and I go find the excellent home health care agency, and then we ask the doctor, his doctor, you know, is he qualified, is he certified, you know, sign off, whatever. The doctor's going to sign up on excellent home health care, but that was at our suggestion, my dad and me. So wouldn't that always be the case? So you're saying that's a referral even though the doctor wasn't even involved, we didn't even ask his opinion, we just went and found this excellent home health care ourselves. And that's what the Seventh Circuit held in Patel, which is cited in the government's brief. Our decision in Miles says there was no evidence the defendant had any authority to act on behalf of a physician in selecting, and that's italicized in the opinions, selecting the particular provider. So doesn't our case law require involvement in selecting the provider when that selection was already made here before the certification form arrived? I don't think Miles can be read that broadly. I mean, Miles also says that the anti-kickback statute is, quote, designed to ensure that a doctor's independent judgment regarding patient care is not compromised by payment from Medicare service providers. So if anything, I think Miles confirms that what Dr. Daley did falls within the confines of the anti-kickback statute. I mean, the narrowing principle is that the payment, the difference in my hypo is, you have not said anything about the doctor getting paid by the referred home health care, so that's an important distinction. And the other distinction is that doesn't the payment have to be made in exchange for the certification? So here, if Dr. Daley was giving a lecture to the home health bar association, I mean our association analogous to the ABA, and was paid for that, that wouldn't be something you could use to show a kickback unless you could show it was for particular certification as opposed to for the speech. Does that make any sense? It does, Judge Haynes. I mean, I don't want to bind the government to facts that are not present here. I mean, here what it was was he was signing the Form 485. I mean, this was a charge basis. It was for his signature on these Form 485s at Section 26. That referred patients to Candid for home health services. So in the hypothetical you discussed where, you know, the doctor speaks to some association and somebody comes and says, you know, here's some money, you did a great job. No, he said he was paid to give a speech, and maybe by a particular health care agency, he paid him to give a speech to some group or, you know, some orientation or whatever that was clearly proper in the sense that he's allowed to be paid for his time in giving the speech. Would that by itself be good enough? I don't think so. I mean, again, these are not the facts here. Well, one thing you may know is that when we write an opinion, believe it or not, the next guy thinks that they need to look at that and be guided by it. And so, yes, we have to think about narrowing principles or broadening principles and how that might be read down the road. So I understand justice in the particular case is the key. But when we write an opinion, we'll recognize that others may be guided by it and look to it for guidance. So to me there needs to be a bit of a limiting principle on the notion that if we have a payment and we have a doctor and we have a health care agency, we're done. Right. I mean, absolutely, Judge Hanson. I mean, here what it is is it's signing in exchange for a referral to a particular home health agency. That is the purpose behind the signature. So in the meeting or in the lecture that you gave, there isn't, at that moment, that expectation that they're going to, you know, they have a certain patient that they're going to refer. I mean, maybe if there's evidence, for example, in the record that let's say. If it was a subterfuge, I know. Yes, absolutely. I'm sure that's why you're worried about agreeing. Absolutely. But, I mean, 42 U.S.C. 1320A-7BB1A says it has to be in return for the certification. So isn't that the limiting principle, whether you like my hypo or not? Yes, Judge Hanson. Okay. Yes, I agree. I want to go back on the anti-kickback statute. You mentioned the Patel case out of the Seventh Circuit, and it extensively discusses Part A of the statute and says, largely based on the purpose of preventing kickbacks, that this type of conduct should be covered. My problem with Patel is it doesn't acknowledge that there's a Part B to the statute. And if Part B would cover this, as you argue, then doesn't that undermine the view that we should read Part A to also cover it? So in my research, I did not see a lot of cases focusing on the Part B. It's mostly under just the Part A, the referral. Now, I believe in the government's brief, there's a Seventh Circuit 1999 decision, I believe it's United States versus Poland, in which they talk about how the terms are somewhat synonymous, recommending specific services versus referral. The difference between the two probably would be if a doctor is saying you're in a meeting, you're seeing a doctor, and the doctor says, hey, I think you need home health services, this would be really good for you. But the problem, though, is that probably the next step, he's going to say, and by the way, you should go to Candid Home Health. I mean, practically speaking, a lot of times a referral is also going to be a recommendation. Well, B also covers services, divorce from, I mean, not sending a patient to a particular place, but even the hospital should buy our new X-ray machine from this company. Correct. Wouldn't that be a B? That would be a B, yes, that's correct. So, you know, and just back on Patel, I mean, the facts of Patel are different. I mean, in Patel, it's actually, I mean, there, the patients actually needed home health care. It was undisputed. They were homebound. They did require it, and it was just, I mean, but the doctor was getting paid, and that was sufficient. And the government submits, Patel is exactly right. If we went the other way, though, and found that the circumstances here were not a kickback, would we be creating a circuit split with the Seventh Circuit? I believe so, Your Honor. I believe so because in this case, again, he is, by virtue of signing Section 26, he is referring the patient too candid for home health. Patel goes through, you know, the broader definition of referral and the referral in the medical context. You know, for example, I hurt my knee, and I go to see my doctor, but I've got a family friend who's an orthopedic surgeon, but my insurance, you know, requires the physician's referral in order for me to go. Yeah, I come up with it, but it's still a referral. By signing the paper, the physician is still referring it. I tell you, doctors are already skittish enough. I mean, you're going to make them even more skittish with that kind of analysis, but that's neither here nor there. We'll decide the case before us, but it is an issue. Respectfully, though, I mean, obviously, I mean, in that, I mean, it's different. I mean, here it's he is being paid by an agency. No, I get that. I get that. Anything else you want to address? No, Your Honor, if there are no further questions, we respectfully request that this court affirm the judgment of the district court. Okay, thank you. Thank you. All right. Mr. Willey, you have time for rebuttal. In the government argument that he just gave you, I'll refer you back to our oral argument exhibit number one, where it is very specific. It says the act that a physician or certain non-physician practitioners, they call them MPPs, document the face-to-face encounter, including those, and it goes on and it says, with the physician's assistant who's working in collaboration with the physician. In accordance with state law. In accordance with state law. And here's the problem. Their argument is Dr. Daley was in accordance with state law, but there's no evidence of that in the record, okay? And the court has to decide this case based upon the record that's in front of it. And the record that's in front of it, he used a qualified PA. Nobody has argued whether or not those two PAs were not qualified. The second thing that I want to address is to Judge Costa's question when he talked about Patel and the Seventh Circuit. That's not Fifth Circuit law. Yes, but would we be creating a circuit split with them to go your way? I mean, we can do it, but we like to know when we're doing it. Yes, you probably would, Your Honor, and I would agree to that, because I would say that the case that binds this court is the United States versus Davis, that's 132 Fed 3rd 1092, 1094, which specifically states that the anti-kickback statute requires proof that a defendant acted knowingly and willfully with criminal intent in paying remuneration to induce referrals or receiving remuneration as an inducement to refer. That did not happen in this case. Let me ask quickly about your Affordable Care Act argument, which most people know is Obamacare. It imposed a new requirement that you had to document a face-to-face encounter before signing this form, basically. But how do you get from that to saying that before this you didn't need to have the face-to-face encounter? Because that's what the statute says, Your Honor. Where? The new law is you have to document the face-to-face encounter. How do you get from that to saying that means you've never even had to have the face-to-face encounter, whether it's documented or not, before Obamacare was? May I step away from the podium for a second to get that? Sure. I'll supplement that to the Court also. When Counsel was arguing, he quoted the wrong section because what it is is the section that is here that's before this Court is 42 CFR 440. And what happened with that is even when they changed the law, the legislators in Congress abated it until Health and Human Services could make the appropriate rules that matched the law. Those rules, and none of these patients that we're talking about in this case even came under the new law. They came under the old law. Those new rules did not go into effect until July 1, 2016. And the Secretary of Health and Human Services said, and I quote, to ensure that states and providers are implementing the rule appropriately, we are delaying compliance with the rule for up to one year if the legislature has met. Otherwise, if the legislature hasn't met, two years. So you have a window. What is the rule that you're referring to, the documentation requirement? The documentation. Because before that, all they had to do was sign the 485s, and that's what the law says. Anything else? We request that the court either render a judgment of acquittal or remand this case for new trial. Okay. Thank you very much. Thanks to both counsel. We have your argument, and the case is under submission, and we are adjourned.